**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

---

Nos. 10-1265 and 10-2332

---

MINARD RUN OIL COMPANY; PENNSYLVANIA
INDEPENDENT OIL AND GAS ASSOCIATION;
ALLEGHENY FOREST ALLIANCE;
COUNTY OF WARREN, PENNSYLVANIA,

v.

UNITED STATES FOREST SERVICE, an agency of the
U.S. Department of Agriculture; TOM TIDWELL, in his
official capacity as Chief of the U.S. Forest Service;
KENT P. CONNAUGHTON, in his official capacity
as regional Forester for the U.S. Forest Service, Eastern
Region; LEANNE M. MARTEN, in her official capacity as
Forest Supervisor for the Allegheny National Forest;
ATTORNEY GENERAL OF THE UNITED STATES OF
AMERICA; FOREST SERVICE EMPLOYEES FOR
ENVIRONMENTAL ETHICS; ALLEGHENY DEFENSE
PROJECT; SIERRA CLUB

Forest Service Employees for Environmental Ethics,
Allegheny Defense Project, Sierra Club,

Appellants.

(Pursuant to Fed. R. App. P. 43 (c)(2))
(Amended Pursuant to the Clerk's Order of June 18, 2010)

On Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. No. 1-09-cv-00125)
District Judge:  Honorable Sean J. McLaughlin

Argued on January 27, 2011

Before:  FUENTES, CHAGARES and ROTH, Circuit Judges

(Opinion filed: September 20, 2011)

Brian J. Sonfield, Esquire
Assistant General Counsel
United States Department of Agriculture
Washington, DC  20250

Ignacia S. Moreno, Esquire
Assistant Attorney General
Aaron P. Avila, Esquire
Ruth Ann Storey, Esquire
United States Department of Justice
Environment & Natural Resources Division
P.O. Box 663
Washington, DC 20044

2

Lane N. McFadden, Esquire
Robert P. Stockman, Esquire  **(Argued)**
 United States Department of Justice
Environment & Natural Resources Division
P.O. Box 23795, L'Enfant Plaza Station
Washington, DC  20026

Counsel for Federal Appellants

Timothy M. Bechtold, Esquire
Bechtold Law Firm
317 East Spruce Street
P. O. Box 7051
Missoula, MT  59807

Marianne Dugan, Esquire **(Argued)**
259 E. 5th Ave., Ste 200-D
Eugene, OR  97401

Counsel for Environmental Appellants

R. Timothy McCrum, Esquire **(Argued)**
J. Michael Klise, Esquire
Daniel W. Wolff, Esquire
Crowell & Moring LLP
1001 Pennsylvania Ave, N.W.
Washington, DC  20004-2595

Matthew L. Wolford, Esquire
638 West Sixth Street
Erie, PA  16507

Steven J. Lechner, Esquire
Mountain States Legal Foundation
2596 South Lewis Way
Lakewood, CO 80227

Counsel for Appellees

_____

O P I N I O N
_____

**ROTH,** Circuit Judge:

## I.  Introduction

This appeal concerns a dispute between the U.S. Forest Service (the Service) and owners of mineral rights in the Allegheny National Forest (ANF).  Although the Service manages the surface of the ANF for the United States, mineral rights in most of the ANF are privately owned. Mineral rights owners are entitled to reasonable use of the surface to drill for oil or gas and from 1980 until recently the Service and mineral owners had managed drilling in the ANF through a cooperative process.  Mineral rights owners would provide 60 days advance notice to the Service of their drilling plans and the Service would issue owners a Notice to Proceed (NTP), which acknowledged receipt of notice and memorialized any agreements between the Service and the

mineral owner about the drilling operations. However, as a result of a settlement agreement with environmental groups, the Service dramatically changed its policy and decided to postpone the issuance of NTPs until a multi-year, forest-wide Environmental Impact Study (EIS) under the National Environmental Policy Act (NEPA) is completed.

Mineral owners and related businesses affected by this new policy sought to enjoin the Service from implementing the policy, which would halt new drilling in the ANF. After holding a hearing and carefully considering the evidence, the District Court issued a preliminary injunction against the Service, prohibiting it from making the completion of the forest-wide EIS a condition for issuing NTPs and requiring it to return to its prior, cooperative process for issuing NTPs. The Service, the Attorney General, and several environmental organizations appeal the preliminary injunction, contending that the District Court lacked jurisdiction and erred in issuing a preliminary injunction. For the reasons that follow, we affirm in all respects the District Court's thorough, well-reasoned opinion.

## II. __Background__

In the 19th century, all the land now comprising the ANF was privately owned. In 1891, Congress authorized the President to designate federal lands as forest reservations in order to preserve valuable timber resources and ensure protection of watersheds. Act of March 3, 1891 § 24, 26 Stat. 1095, 1103, *codified at* 16 U.S.C. § 471 (repealed) (the 1891 Act). In 1897, Congress passed the Organic Act authorizing the Secretary of Agriculture to regulate "occupancy and use" of forest reservations designated under the 1891 Act. 30 Stat.

5

11, 34, *codified at* 16 U.S.C. § 475. These Acts, however, did not authorize the purchase of land to establish federal forest reservations – they were limited to land already owned by the federal government or acquired for other purposes. After considerable controversy and a decade of campaigning, *see* S. REP. NO. 60-459, at 13 (1908) (describing history of forest preservation bills), Congress passed the Weeks Act in 1911. Pub. L. No. 61-435, 36 Stat. 961. The Act set aside funds for purchase of private land by the Secretary of Agriculture to serve as forest reservations under the Organic Act. *Id.* §§ 4-8, 36 Stat. at 962. Before purchasing land in a State, the Act required the Secretary to obtain the State's consent. *Id.* § 7, 36 Stat. at 962. In the decades following the Act, the Secretary purchased large tracts of forest land, and in 1923, President Coolidge designated the lands acquired in Pennsylvania as the Allegheny National Forest. 43 Stat. 1925.

### A. *Mineral Rights in the Allegheny National Forest*

Coal mining was common in the Allegheny Plateau and oil had been discovered in the area in 1859. To acquire as much land as possible with limited funds, the Secretary of Agriculture purchased large tracts of surface estate in the ANF while leaving valuable mineral rights in private hands. As a result, over 93% of the mineral estates in the ANF are privately owned. The mineral rights in the ANF are of two kinds: reserved rights and outstanding rights.

Reserved rights are those reserved by the fee owner in the deed conveying surface ownership to the United States. The Weeks Act authorized the Secretary to acquire surface estates with a reservation of rights to the grantor and provided

6

that the exercise of reserved rights would be subject to the "rules and regulations" promulgated by the Secretary and included in the instrument of conveyance. 16 U.S.C. § 518. Reserved rights are usually referred to by the year of promulgation of the regulations in effect at the time of federal acquisition, *i.e.*, 1911, 1937, 1947, or 1963 reserved rights. About 48% of the mineral rights in the ANF are reserved rights and the vast majority of these are 1911 rights. (J.A. 157, 254-55.) The 1911 regulations were quite minimal, and generally required mineral rights owners to use no more of the surface than reasonably necessary, pay for any timber cut down when clearing space for wells, take appropriate measures to prevent fire, and remove all facilities or refuse when drilling operations cease.[1] The 1911 regulations did not

---

[1] These regulations essentially required mineral rights owners to do the following:

(1) Furnish proof of mineral rights ownership upon demand by the Service,

(2) Use only so much of the surface as is necessary for mining operations,

(3) Take all reasonable and usual precautions in making tunnels and shafts to support surface land, subject to inspection by the Service or other federal officials,

(4) Pay (at locally prevailing rates) for timber cut, destroyed, or damaged in mining operations,

(5) Remove all buildings, camps, or equipment within six months after completion or abandonment of mining operations,

(6) Dispose of destructible refuse interfering with forest administration within six months after completion or abandonment of mining operations, and

7

require mineral rights owners to obtain a permit from the Service in order to exercise their mineral rights.

Outstanding rights are those that were severed from the surface estate prior to its conveyance to the United States. The Weeks Act was amended in 1913 to permit acquisition of severed surface estates with outstanding mineral rights, provided that the National Forest Reservation Commission concluded that these rights would not hinder administration of the forest reservation. 37 Stat. 828, 855 (1913). Until recently, the Service maintained that its regulations did not apply to outstanding mineral rights.[2] Rather, because outstanding mineral rights were reserved prior to conveyance to the United States, these rights are governed by the terms of the earlier conveyance severing the mineral rights and Pennsylvania property law. *See United States v. Minard Run Oil Co.*, No. 90-12, 1980 U.S. Dist. LEXIS 9570, at *14-15 (W.D. Pa. Dec. 16, 1980) (*Minard Run I*).

---

(7)  Use "due diligence" to avoid or suppress fires in the area.

*Minard Run Oil Co. v. U.S. Forest Service, No. 09-125, 2009 WL 4937785, at *3-4 (W.D. Pa. Dec. 15, 2009) (Minard Run II).*

[2] For example, the Forest Service Manual (FSM) states that "[t]he Secretary's rules and regulations do not apply to the administration of outstanding mineral rights." FSM § 2830.1 The Service's 1984 ANF Handbook similarly states that outstanding mineral rights "*are not* subject to any of the Secretary of Agriculture's rules and regulations." ANF Handbook, ch. 2, p.11 (1984) (emphasis in original).

Under Pennsylvania law, the mineral estate is the dominant estate and entails the right to use of as much surface land as reasonably necessary to extract minerals. *Belden & Blake Corp. v. DCNR*, 969 A.2d 528, 532 (Pa. 2009). Although the mineral owner must show "due regard" to the rights of the surface owner, the mineral owner need not obtain consent or approval before entering land to mine for minerals. *Id.* at 533; *see also Minard Run I*, 1980 U.S. Dist. LEXIS 9570, at *13 (mineral rights owner has an "unquestioned right" to enter the property, subject to "minor restrictions which . . . should not seriously hamper the extraction of oil and gas"). *Minard Run I* concluded that "due regard" to the Service as surface owner required owners of outstanding mineral rights to provide information regarding drilling plans to the Service "no less than 60 days in advance" of commencing drilling operations. *Id.* at *22.

The Service's 1984 ANF Handbook incorporated the *Minard Run I* framework into its "standard operating procedures" for outstanding mineral rights in the ANF. Congress codified the notice provisions of *Minard Run I* in the Energy Policy Act of 1992, Pub. L. No. 102-486 § 2508, 106 Stat. 2776, 3108, *codified at* 30 U.S.C. § 226(o). Until the change in policy that is the subject of this litigation, the Service and mineral rights owners in the ANF had relied on the *Minard Run I* framework and taken a cooperative approach to oil and gas drilling in the ANF. Under this framework, mineral rights owners who planned to conduct drilling operations would provide the Service with the required notice and the two parties would then negotiate the details of drilling operations, such as the location of wells or access roads, so as to prevent any unnecessary surface use. At the end of this process, the Service would issue a Notice to

Proceed (NTP) to the mineral rights owner, which acknowledged receipt of notice from the mineral rights owner and memorialized any agreements between the parties regarding drilling operations.[3]

## B. *The Service's Policy Regarding NEPA and Split Estates*

The National Environmental Policy Act of 1969, Pub. L. No. 91-190, 83 Stat. 852 (NEPA) requires federal agencies to file an environmental impact study (EIS) before taking any "major federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). The Service completed EISs in 1986 and 2007 in connection with adoption of a Forest Plan for the ANF, which governs the Service's management of the forest. The Service did not suspend the issuance of NTPs during these EISs. The Service also occasionally conducted an Environmental Assessment (EA) – a summary environmental analysis less demanding than an EIS – when issuing certain NTPs. Although only limited information on these EAs is available, they appear to have been completed quite promptly and within the 60-day *Minard Run I* framework. However, until recently, the Service took the position that issuance of an NTP to a mineral rights owner was not a "major federal action" requiring environmental analysis under NEPA because the Service's

---

[3]Drilling in the ANF is regulated by the Pennsylvania Department of Environmental Protection (DEP) and subject to a permit process, *see* 25 Pa. Stat. §§ 77.51, 78.1, 86.11. A permit is usually obtained before applying for an NTP. As an affected landowner, the Service has the right to participate in the permit process and challenge the terms of a permit.

rights as surface owner were so limited. (J.A. 182-83 (testimony before Congress), 185-86 (legal opinion provided to Congress).) When interacting with mineral rights owners in the ANF, the Service viewed itself as a resource management agency negotiating use of jointly owned land, not as a regulatory agency issuing permits.

### C. *Changes in Forest Service Policy*

Several changes in the Service's policy led to this litigation. On May 24, 2007, an attorney in the Service's Office of General Counsel authored a memorandum concluding that the issuance of an NTP is a "major federal action" subject to NEPA. The memo relied heavily on *Duncan Energy Co. v. U.S. Forest Service*, 109 F.3d 497 (8th Cir. 1997) (*Duncan I*), and adopted a broader interpretation of the Service's authority over 1911 reserved rights than was adopted in *Minard Run I*, which the memorandum cited only once and did not discuss. However, there was no immediate change in the Service's policy in response to this memorandum.

On November 20, 2008, the Forest Service Employees for Environmental Ethics (FSEEE) and the Sierra Club filed suit against the Service seeking a declaration that its practice of issuing NTPs without conducting an appropriate environmental analysis under NEPA was contrary to law and also seeking an injunction against issuance of further NTPs without proper NEPA analysis. *See FSEEE v. U.S. Forest Service*, No. 08-323, 2009 WL 1324154 (W.D. Pa. May 12, 2009). On January 16, 2009, while the action was still pending, the Service ceased processing and issuing NTPs, explaining that this was being done "[i]n light of pending

11

litigation" and that the Service intended to file a Notice of Intent to prepare an EIS the following month. On April 9, 2009, the parties to the *FSEEE* litigation entered into a Settlement Agreement purporting to resolve all claims. The Settlement Agreement provided that, with the exception of 54 grandfathered NTP applications,

> [the Service] agrees that it shall undertake appropriate NEPA analysis prior to issuing Notices to Proceed, or any other instrument authorizing access to and surface occupancy of the Forest for oil and gas projects on split estates including both reserved and outstanding mineral interests. Appropriate NEPA analysis shall consist of the use of a categorical exclusion or the preparation of an Environmental Assessment or an Environmental Impact Assessment.

The Pennsylvania Independent Oil and Gas Association (PIOGA) and the Allegheny Forest Alliance (AFA), both appellees in this action, were not included in the settlement negotiations but sought to intervene in the case once they learned that the case might settle. Although PIOGA and AFA were permitted to intervene in the *FSEEE* action, the district court declined to consider their objections to the settlement and approved voluntary dismissal of the case. *FSEEE*, 2009 WL 1324154, at *4.

On April 10, 2009, ANF Forest Supervisor Leanne Marten issued a statement (the Marten Statement) explaining that, because of the Settlement Agreement, "[a]ll . . . pending oil and gas proposals, and all future proposals, will be

12

processed after the appropriate level of environmental analysis has been conducted under the NEPA." Marten announced that the Service would be "initiating a forest-wide site specific environmental analysis for proposals that were not included in the settlement and any other proposals for activity anticipated between now and 2013," and that this process was estimated to take until at least mid-April 2010. Aside from the 54 NTP applications identified in the Settlement Agreement, no new drilling in the ANF would be authorized until the forest-wide EIS was complete.

As these policy changes were taking place, the Service took the position that mineral rights owners were required to obtain an NTP prior to making any changes to land in the ANF. For example, in a 2008 letter, the Service advised a mineral rights owner that "entry upon, and removal of, timber from National Forest System lands requires the express prior written approval of the Forest Service" and that "[f]ailure to do so is a violation of both federal and state law and federal regulation." The Service directed the recipient's "considered attention" to several statutes imposing criminal penalties for failure to abide by Service regulations. Since the Settlement Agreement and the Marten Statement, the Service has warned mineral rights owners and their contractors on several occasions that new drilling operations without an NTP are not permitted and may result in criminal penalties. Although the Service does not appear to have formally adopted a rule to this effect, it has acknowledged that new drilling without an NTP may result in a civil enforcement action or criminal penalties.

13

**D.** *Litigation*

On June 1, 2009, PIOGA, AFA, Minard Run Oil Company, and the County of Warren brought suit against the Service and three of its officers, the Attorney General, FSEEE, the Sierra Club, and the Allegheny Defense Fund. The plaintiffs' complaint alleged that, as a result of the Settlement Agreement, the Service had imposed a *de facto* drilling ban in the ANF until a forest-wide EIS is completed and that this ban exceeded the authority of the Service and was contrary to NEPA and the Administrative Procedure Act (APA). Additionally, plaintiffs allege that because the Service's estimated completion date for its forest-wide EIS – April 2010 – is unrealistic, the EIS will probably not be completed for several years. As a result, mineral rights owners will be prevented from exercising their property rights during this period, resulting in damage to the owners, related businesses, and the local community.

At a hearing on the preliminary injunction motion, plaintiffs presented the testimony of several business owners, who testified that, as a result of the Service's ban on new drilling, they were prevented from drilling new wells, causing significant losses to their businesses and harm to the community. Plaintiffs also presented testimony from several former Forest Rangers who had worked in the ANF, who described the Service's historical practices regarding NTPs and EISs and estimated that the EIS would probably require at least several years to complete.

The Service presented the testimony of ANF Forest Supervisor Leanne Marten and Forest Ranger Richard Scardina. These witnesses claimed that, starting in 2007,

14

there was a significant increase in the number of NTP applications. They explained that a forest-wide EIS is necessary before approving any new NTPs, because the Service's prior policy of individualized assessment of NTP applications has hindered forest management, resulting in duplicative roads or development facilities for adjoining pieces of land, and unnecessary clearing of the forest. The environmental defendants presented the testimony of two members of local environmental organizations who claimed that the natural beauty of the ANF had been impaired by oil and gas drilling. Plaintiffs disputed much of this testimony and presented rebuttal witnesses.

The District Court granted plaintiffs' motion for a preliminary injunction. The court found as follows: The Settlement Agreement and the Marten Statement represented "a fundamental 'sea change'" in the Service's policy; therefore, they constituted final agency action subject to review under the APA. *Minard Run Oil Co. v. U.S. Forest Service,* No. 09-125, 2009 WL 4937785, at *22 (W.D. Pa. Dec. 15, 2009) (*Minard Run II*). The effect of this policy was a "drilling ban," which precluded new drilling in the ANF (with the exception of the 54 grandfathered NTP applications) until the Service completed a forest-wide EIS. *Id.* at *14-15. The Service had instituted the drilling ban without following the APA's notice and comment procedures, and the ban was not justified under NEPA because the issuing of an NTP was not a major federal action. The preparation of the EIS would likely last several years, resulting in irreparable harm to the plaintiffs, and the balance of the equities and the public interest favored an injunction. *Id.* at *32-33.

15

The District Court then enjoined the Service "from requiring the preparation of a NEPA document as a precondition to the exercise of private oil and gas rights in the ANF," and required the Service to return to the 60-day cooperative framework for processing NTPs that had been in place prior to the *FSEEE* Settlement. *Id.* The preliminary injunction was entered on December 15, 2009. The District Court denied appellants' motion for reconsideration on March 9, 2010, and this appeal followed.

## II. **Jurisdiction**

We have appellate jurisdiction under 28 U.S.C. § 1292(a)(1). The Service argued that the District Court lacked jurisdiction because there is no final agency action subject to review.[4] Because final agency action is a jurisdictional issue,

---

[4]The environmental appellants also claim that appellees lack standing to challenge the Settlement Agreement because it did not cause them any harm and suspending its application would not redress any injury allegedly suffered by appellees. *See Freeman v. Corzine*, 629 F.3d 146, 153 (3d Cir. 2010) (constitutional standing requires (1) injury in fact, (2) causation, and (3) redressability). We disagree. As the District Court found, the Marten Statement is the direct result of the Settlement Agreement – its first sentence describes the terms of the Agreement. Even if the environmental appellants are correct that the Agreement does not require the multi-year EIS that the Service has chosen to implement prior to issuing NTPs, the Agreement nevertheless establishes – in violation of appellees' notice and comment rights – a new substantive rule on the issuance of NTPs that could delay issuance of NTPs to appellees. This suffices for

16

*TSG Inc. v. EPA*, 538 F.3d 264, 267 (3d Cir. 2008), we review *de novo* the District Court's finding of final agency action, *Umland v. PLANCO Fin. Servs., Inc.*, 542 F.3d 59, 63 (3d Cir. 2008). The APA provides for judicial review of "final agency action," 5 U.S.C. § 702, which is present when two conditions are met:

> First, the action must mark the "consummation" of the agency's decisionmaking process – it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which "rights or obligations have been determined," or from which "legal consequences will flow."

*TSG Inc.*, 538 F.3d at 267 (quoting *Bennett v. Spear*, 520 U.S. 154, 178 (1997)). We conclude that the Marten Statement constitutes final agency action.

First, the Marten Statement represents the consummation of the Service's decisionmaking process on the specific question of whether to issue NTPs while the Service is conducting a lengthy EIS. The Service argues that this decision is "interlocutory," *TSG Inc.*, 538 F.3d at 267, or a "preliminary, procedural, or intermediate agency action," 5 U.S.C. § 704, which will not be final until the EIS is complete and NTPs are issued. We agree with the Service that the completion of the EIS or issuance of an NTP would constitute final agency action, but that does not mean that any

standing purposes. *See Massachusetts v. EPA*, 549 U.S. 497, 518 (2007); *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 573 n.8 (1992).

determinations made by the Service prior to these actions are not final. An agency determination of a particular issue that will not be reconsidered in subsequent agency proceedings may represent the consummation of the agency's decisionmaking process on that issue. *Compare Fairbanks North Star Borough v. U.S. Army Corps of Engineers*, 543 F.3d 586, 591 -592 (9th Cir. 2008) (finding of Clean Water Act jurisdiction was consummation of decisionmaking process on jurisdiction because subsequent regulatory proceedings would not revisit this determination) *with In re Sac & Fox Tribe of Miss. in Iowa/Meskwaki Casino Litig.*, 340 F.3d 749, 756 (8th Cir. 2003) (temporary closure order not final because order was preliminary and subject to further administrative review).[5] The Service does not claim that it will revisit the propriety of imposing a moratorium on new drilling in the ANF during the forest-wide EIS, and by the time the EIS is completed, the propriety of the moratorium will be moot. Accordingly, the Marten Statement represents the consummation of the Service's decisionmaking process with respect to the moratorium on new drilling.

---

[5] The Service points out that the Ninth Circuit ultimately found no final agency action in *Fairbanks*. 543 F.3d at 593-94. However, this holding rested on the second *Bennett* factor – whether agency action has concrete legal consequences. *Id.* The jurisdictional finding at issue in *Fairbanks* did not affect rights and obligations because "[i]t does not itself command Fairbanks to do or forbear from anything; as a bare statement of the agency's opinion, it can be neither the subject of 'immediate compliance' nor of defiance." *Id.* As we explain below, this is not true of the moratorium on new drilling imposed by the Marten Statement.

18

Second, the Service's moratorium on new drilling has significant legal consequences for mineral rights owners: they must stop all new drilling or face criminal penalties. *See Abbott Labs. v. Gardner*, 387 U.S. 136, 154 (1967) (finding final agency action "where a regulation requires an immediate and significant change in the plaintiffs' conduct of their affairs with serious penalties attached to noncompliance"). The Service contends that its moratorium on new drilling is analogous to a merely procedural or jurisdictional determination that has the incidental effect of delaying agency proceedings. We disagree. As the District Court found, the moratorium represents a "sea change" in the Service's policy regarding mineral rights that directly prohibits mineral rights owners from engaging in new drilling, under threat of criminal penalties. *Minard Run II*, 2009 WL 4937785, at *22. The burden imposed by the moratorium goes far beyond "the expense and annoyance of litigation [that] is part of the social burden of living under government." *FTC v. Standard Oil Co.*, 449 U.S. 232, 238, 244 (1980) (filing of complaint commencing agency enforcement action was not final agency action); *see also Myers v. Bethlehem Shipbuilding Corp.*, 303 U.S. 41, 47 (1938) (agency decision to hold hearing is not reviewable); *Univ. of Med. and Dentistry of N.J. v. Corrigan*, 347 F.3d 57, 69 (3d Cir. 2003) (initiation of audit not final agency action); *Mobil Exploration & Producing U.S., Inc. v. DOI*, 180 F.3d 1192, 1200-01 (10th Cir. 1999) (letter requesting information not final agency action). Nor is this a case in which an agency's procedural determinations have the incidental effect of delaying the acquisition of a concededly necessary regulatory decision. *See, e.g.*, *Aluminum Co. of Am. v. United States*, 790 F.2d 938, 941 (D.C. Cir. 1986) (ICC assertion of

original jurisdiction that would require more "costly and time-consuming proceedings" than alternative review method was not final agency action). Rather, the purpose of the Service's change in policy is to suspend new drilling and its authority to do so is precisely what is at issue here.

Finally, we note that final agency action "is to be given a pragmatic definition." *Exxon Corp. v. FTC*, 588 F.2d 895, 901-02 (3d Cir. 1978). We have identified a number of pragmatic considerations relevant to whether agency action is final:

> (1) whether the decision represents the agency's definitive position on the question; (2) whether the decision has the status of law with the expectation of immediate compliance; (3) whether the decision has immediate impact on the day-to-day operations of the party seeking review; (4) whether the decision involves a pure question of law that does not require further factual development; and (5) whether immediate judicial review would speed enforcement of the relevant act.

*Corrigan*, 347 F.3d at 69 n.7. Each of these considerations favors a finding of finality here. The Marten Statement represents the Service's final position on the need for a drilling moratorium, which will not be revisited in subsequent proceedings. It is evident that the Service expects mineral owners to refrain from new drilling during the moratorium and has threatened criminal enforcement against mineral owners who proceed with drilling without an NTP. The moratorium on new drilling directly affects the daily

20

operations of mineral owners and related businesses and has already caused them significant losses. Whether the Service's moratorium is required by NEPA and consistent with the APA are pure questions of law that require no further factual development. Finally, our review of the claims presented here will facilitate a prompt and efficient resolution of questions regarding the scope of the Service's authority over private mineral rights in the ANF and its obligations under NEPA.[6] We therefore conclude that the Service's moratorium on new drilling in the ANF, as reflected in the Settlement Agreement and the Marten Statement, constitutes final agency action.[7] Accordingly, the District Court had

---

[6] We note that a number of mineral owners have brought individual challenges to NTPs recently issued by the Service, which raise many of the same issues presented in this case. *See Duhring Resource Co. v. U.S. Forest Serv.*, No. 07-314 (W.D. Pa.); *Catalyst Energy, Inc. v. U.S. Forest Serv.*, No. 09-70 (W.D. Pa.); *Seneca Res. Corp. v. U.S. Forest Serv.*, No. 09-154 (W.D. Pa.). In each of these cases, a mineral rights owner contends that the Service has violated its property rights and constitutional rights by prohibiting oil and gas development without an NTP, delaying the issuance of his NTP beyond 60 days, and imposing unreasonable conditions in the NTP. Because these cases challenge NTPs already issued, there is little question that there is final agency action in each of these cases. However, we believe that the issues presented both in those cases and in this appeal are better resolved comprehensively in this appeal rather than addressing them piecemeal in a series of cases.

[7] Strictly speaking, the Marten Statement is final agency action, and the Settlement Agreement is an

21

jurisdiction in this case and we turn to the merits of its decision.

## III. **The Preliminary Injunction**

To obtain a preliminary injunction, a plaintiff must show: "(1) a likelihood of success on the merits; (2) that it will suffer irreparable harm if the injunction is denied; (3) that granting preliminary relief will not result in even greater harm to the nonmoving party; and (4) that the public interest favors such relief." *Kos Pharm. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004). In reviewing a preliminary injunction, we "exercise plenary review over the district court's conclusions of law and its application of law to the facts, but review its findings of fact for clear error." *Id.* We review the court's ultimate decision to issue an injunction for abuse of discretion. *See Nken v. Holder*, 129 S. Ct. 1749, 1761 (2009); *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharmaceuticals Co.*, 290 F.3d 578, 595 (3d Cir. 2002).

### A. *Likelihood of Success on the Merits*

The District Court found that appellees were likely to prevail on the merits of two claims: (1) issuance of an NTP is not a major federal action for which prior NEPA analysis is required, and (2) the Settlement Agreement and the Marten Statement are substantive rules that were not preceded by notice and comment procedures as required by the APA. We consider each in turn.

---

"intermediate agency action" which is "subject to review on the review of the final agency action." 5 U.S.C. § 704.

1. *Whether Issuance of an NTP Must be Preceded by NEPA Analysis*

The merits of appellees' first claim turns on whether the issuance of an NTP is a "major federal action[] significantly affecting the quality of the human environment," which under NEPA must be preceded by an appropriate environmental analysis. 42 U.S.C. § 4332(C). We have identified three types of agency action that typically constitute "major federal action": "first, where the agency itself undertook a project; second, where the agency supported a project by contract, grant, loan, or other financial assistance; and third, where the agency enabled the project by lease, license, permit, or other entitlement for use." *N.J. Dept. of Envt'l. Prot. and Energy v. Long Island Power Auth.*, 30 F.3d 403, 417 (3d Cir. 1994). But "[f]ederal approval of a private party's project, where that approval is not required for the project to go forward, does not constitute a major federal action." *Id.*; *see also Sierra Club v. Penfold*, 857 F.2d 1307, 1310 (9th Cir. 1988). Accordingly, the dispositive question is whether mineral owners are required to obtain the approval of the Service, in the form of an NTP, before drilling in the ANF. We conclude that such approval is not necessary.

The Service points out that Congress has broad authority under the Property Clause of the Constitution to regulate land owned by the federal government as well as use of private land that affects federal land. *See Kleppe v. New Mexico*, 426 U.S. 529, 540 (1976). Congress has also

23

authorized the Service to regulate use of national forests.[8] The Organic Act authorizes the Service "to make such rules and regulations . . . as will insure the objects of [forest] reservations, namely, to regulate their occupancy and use and to preserve the forests thereon from destruction." 16 U.S.C. § 551. "Special use regulations" promulgated under the Act provide that "all uses of National Forest System land . . . are designated 'special uses' and must be approved by an authorized officer." 36 C.F.R. § 251.50(a). The Service argues that drilling by mineral owners in the ANF is a "special use" subject to its approval. *See Duncan Energy v. U.S. Forest Service*, 50 F.3d 584, 589 (8th Cir. 1995) (*Duncan I*) (special use regulations apply to mineral owners' access to land purchased under the Bankhead-Jones Farm Tenant Act).

We disagree. As a preliminary matter, we note that the Service's regulatory authority over Weeks Act land is not as straightforward as it claims. The Organic Act's grant of regulatory authority applies to "the public forests and national forests which may have been set aside or which may be hereafter set aside under section 471 of this title." 16 U.S.C. § 551. Section 471 (now repealed) authorized the President to designate already owned federal lands as national forests, but did not authorize the purchase of private land, including land with reserved or outstanding rights. 16 U.S.C. 471, *repealed by* Pub. L. 94–579, title VII, § 704(a), 90 Stat. 2792 (1976). When the Organic Act was passed, the regulation of

---

[8]The statutes authorize regulation by the Secretary of Agriculture, who has delegated much of his statutory authority over the national forests to the Chief of the Forest Service. *See* 7 C.F.R. § 2.60.

"occupancy and use" did not contemplate the regulation of access by a cotenant.

The Weeks Act was the first law to authorize federal acquisition of private land for forest preservation. It provides that land acquired under the Act "shall be permanently reserved, held, and administered as national forest lands under the provisions of section 471 of this title," 16 U.S.C. § 521. This provision "arguably requires treating such land as if it had been reserved under section 471" and could therefore be subject to the Service's regulatory authority under the Organic Act. *United States v. Srnsky*, 271 F.3d 595, 601 (4th Cir. 2001). However, even if Congress meant by this language to subject Weeks Act land to the Service's regulatory authority under the Act, it intended to authorize the Service to regulate the exercise of reserved or outstanding rights by a joint owner of Weeks Act land.

Indeed, section 9 of the Weeks Act suggests that this was not Congress's intent. Section 9 governs the acquisition of forest land, and provides:

> Such acquisition by the United States shall in no case be defeated because of located or defined rights of way, easements, and reservations, which, from their nature will, in the opinion of the Secretary of Agriculture, in no manner interfere with the use of the lands so encumbered, for the purposes of this Act. Such rights of way, easements, and reservations retained by the owner from whom the United States receives title, shall be subject to the rules and regulations prescribed by the Secretary of

25

Agriculture for their occupation, use, operation, protection, and administration, and *such rules and regulations shall be expressed in and made part of the written instrument conveying title to the lands to the United States*; and the use, occupation, and operation of such rights of way, easements, and reservations shall be under, subject to, and in obedience with the rules and regulations so expressed.

16 U.S.C. § 518 (emphasis added).  Thus, under section 9, reserved rights – "rights of way, easements, and reservations retained by the owner from whom the United States receives title" – are subject to the regulations "expressed in and made part of the written instrument conveying title to the lands to the United States." *Id.*

The Service points out that nothing in this provision provides that reserved mineral rights are subject *only* to regulations in the instrument of conveyance – it is possible that reserved rights are subject to the Service regulations contained in the written instrument of conveyance *and* to other regulations not contained in the instrument.  There are two problems with this interpretation.  First, it renders the provision superfluous:  Congress would not have mandated the inclusion of regulations in deeds with reserved rights if those rights were subject to all generally applicable Service regulations – the general regulatory authority granted under the Organic Act would have been sufficient.  *See Massie v. U.S. Dept. of Housing and Urban Dev.*, 620 F.3d 340, 352 (3d Cir. 2010) ("a core tenet of statutory interpretation [is] that no provision shall be superfluous, void, or insignificant") (internal quotation marks omitted); *In re Philadelphia*

26

*Newspapers, LLC*, 599 F.3d 298, 307 (3d Cir. 2010) (warning against "applying a general provision when doing so would undermine limitations created by a more specific provision").

Second, as the Fourth Circuit noted in *Srnsky*, the regulatory authority claimed by the Service "has no logical stopping point" and would therefore raise difficult constitutional questions. 271 F.3d at 604. For example, on the Service's view, it would have the authority to require any holder of reserved rights of any kind – even an easement or right of way – to obtain a permit prior to exercising their rights. This would effectively "wipe the National Forest System clean of any and all easements, implied or express" and dramatically reduce the value of reserved mineral and timber rights. *Id.* We do not believe that this is what Congress intended, and, like the Fourth Circuit, we are reluctant to construe the Weeks Act "'in a manner that could in turn call upon the Court to resolve difficult and sensitive questions arising out of the guarantees of the takings clause.'" *Id.* (quoting *United States v. Security Indus. Bank*, 459 U.S. 70, 82 (1982)). The better reading of the Weeks Act is that it "require[s] that any rules or regulations that the Secretary wishes to apply to easements reserved by the grantor must be 'expressed in and made part of' the instrument of conveyance." *Srnsky*, 271 F.3d at 602.

These considerations apply with even greater force to outstanding rights. Although the Weeks Act contains no limiting language regarding the regulations applicable to outstanding rights, this is because outstanding rights are created prior to conveyance to the United States and there is no opportunity to limit these rights by inserting regulations into the instrument defining these rights. Moreover, the

27

language of the Weeks Act indicates that Congress expected the United States to be bound by the terms of outstanding rights – purchase of land with outstanding rights is permitted only where such rights "from their nature will, in the opinion of the Secretary of Agriculture, in no manner interfere with the use of the lands so encumbered, for the purposes of this Act." 16 U.S.C. § 518. This limitation only makes sense if the Service is bound by the terms of outstanding rights and cannot simply invoke its regulatory authority to override any private use of outstanding rights that it considers inconsistent with the purposes of the Weeks Act. Additionally, as with reserved rights, we are reluctant to construe the Weeks Act in a manner raising difficult constitutional takings questions absent a clear indication of congressional intent.[9]

As the District Court recognized, *Duncan Energy Co. v. U.S. Forest Service*, 50 F.3d 584 (8th Cir. 1997) (*Duncan I*) does not support the Service's broad claim of regulatory

---

[9] The Service's construction of the Weeks Act and the Organic Act as conferring regulatory authority over outstanding rights is not entitled to deference. This interpretation was adopted in a 2007 General Counsel opinion (J.A. 380-83 & n.5), not in a formal adjudicatory or rulemaking proceeding, and thus is not entitled to *Chevron* deference. *See De Leon-Ochoa v. U.S. Att'y Gen.*, 622 F.3d 341, 348-49 (3d Cir. 2010) (citing *United States v. Mead Corp.*, 533 U.S. 218 (2001)). Even *Skidmore* deference is unwarranted here, because the Service's current interpretation is an unexplained departure from its longstanding view that its regulations do not apply to outstanding mineral rights. *See Wyeth v. Levine*, 129 S. Ct. 1187, 1201 (2009).

28

authority.[10]  In *Ducan I*, the Eighth Circuit held that a private mineral rights owner seeking to drill in a national forest acquired under the Bankhead-Jones Farm Tenant Act, 50 Stat. 525 (1937) (BJFTA), *codified as amended at* 7 U.S.C. § 1010, *et seq.*, was required to obtain authorization from the Service before beginning mining operations.  50 F.3d at 589-91.  The court acknowledged that the mineral rights owner had a right under state law to reasonable use of the surface estate and thus the Service did not have "veto authority" over mineral rights owners' surface use.  *Id.* at 589.  But the Service's "special use regulations" governed surface use by mineral rights owners and empowered it to determine whether an owner's proposed surface use was reasonable.  *Id.* at 590-91.  To respect the rights of the mineral owner, the Service was required to process requests for surface use within a reasonable time – generally 60 days.  *Id.*; *see also Duncan Energy Co. v. U.S. Forest Serv.*, 109 F.3d 497, 499 (8th Cir. 1997) (*Duncan II*) (clarifying that an inflexible 60-day limit was not required).  The court found that this rule was

---

[10]  The Fifth Circuit's recent decision in *Dunn-McCampbell Royalty Interest, Inc. v. National Park Service*, 630 F.3d 431 (5th Cir. 2011), is also inapposite.  That case considered land acquired under the Enabling Act of 1962, 16 U.S.C. §§ 459d-459d-7, not under the Weeks Act, and the question presented by the case was whether a Texas statute consenting to federal acquisition of the land protected both reserved and outstanding rights.  *Id.* at 433.  The Fifth Circuit found that the plain language of the consent statute extended only to reserved rights, but not outstanding rights.  *Id.* at 436-37.  Because the language of the Texas statute is different from the relevant provision of the Weeks Act, this case is not relevant.

consistent with North Dakota law.  *Duncan I*, 50 F.3d at 591-92.

　　*Duncan I* is inapposite for several reasons.  First, the land at issue in *Duncan I* was not acquired under the Weeks Act, but under BJFTA, which does not contain the limiting language of the Weeks Act discussed above.  *Compare* Pub. L. No. 75-210, 32(a), 50 Stat. 522, 525-26 (1937) *with* 16 U.S.C. 518.   Second, *Duncan I* found that the authority asserted by the Service was consistent with the rights of mineral owners under North Dakota property law.  Here, by contrast, Pennsylvania law is flatly inconsistent with the authority asserted by the Service.  In a case very similar to this one, the Pennsylvania Supreme Court rejected a claim by the Pennsylvania Department of Conservation of Natural Resources that, as surface owner, it could "impose conditions restraining those exercising their rights to the subsurface." *Belden & Blake Corp.*, 969 A.2d at 532.  The Court explicitly held that a surface owner has no right to determine what constitutes reasonable use in the first instance, and a mineral rights owner is under no obligation to obtain the surface owner's approval prior to accessing the surface to extract mineral rights.   *Id.*    Third, the Service's multi-year moratorium on new drilling could not be justified even under the Eighth Circuit's rulings in *Duncan I* and *Duncan II*.  In *Duncan II*, the Eighth Circuit held that the Service must be accorded some flexibility in issuing permits and could not be held to a strict, 60-day limit.   109 F.3d at 501.   But the indefinite suspension of NTPs for several years goes far beyond the type of delay contemplated in *Duncan II*.  *See* 109 F.3d at 500 n.1 (mineral rights owner's applications for surface access were processed in 61, 74, and 90 days and that

30

owner had improperly taken unilateral action when application had not been processed for 100 days).[11]

In sum, the Service does not have the broad authority it claims over private mineral rights owners' access to surface lands. Its special use regulations do not apply to outstanding rights and the limited regulatory scheme applicable to the vast majority of reserved rights in the ANF does not impose a permit requirement.[12] Although the Service is entitled to

---

[11] Because we find that the Service does not have the regulatory authority it claims under the Organic Act and Weeks Act, we need not consider the Service's arguments that federal common law would govern the United States' property rights or that federal law preempted state property law. *See Duncan I*, 50 F.3d at 591. In any case, the Service waived these arguments when it conceded before the District Court that Pennsylvania law was not preempted and argued that its new drilling moratorium was consistent with Pennsylvania law. (J.A. 647-48, 1393-95); *Minard Run II*, 2009 WL 4937785, at *13.

[12] The vast majority of the reserved mineral rights in the ANF are 1911 rights, which the District Court found do not impose a permit requirement or empower the Service to unilaterally determine what constitutes reasonable surface use. *Minard Run II*, 2009 WL 4937785, at *3. The Service claims that some versions of the 1911 regulations require its approval of the location of access roads and buildings. (Appellant's Br. 44 (citing J.A. 384-86, 449, 454, 2421-28).) However, the Service's 1984 ANF Handbook states that 1911 rights do not impose a permit requirement (J.A. 255), and appellees' expert opined without contradiction that the seven-section version of the 1911 regulations considered by the

31

notice from owners of these mineral rights prior to surface access, and may request and negotiate accommodation of its state-law right to due regard, its approval is not required for surface access. An NTP is an acknowledgment that memorializes any agreements between the Service and a mineral rights owner, but it is not a permit. Accordingly, on the record before it, the District Court properly concluded that issuance of an NTP is not a "major federal action" under NEPA and an EIS need not be completed prior to issuing an NTP. *See Sierra Club v. Penfold*, 857 F.2d 1307, 1310 (9th Cir. 1988); *Long Island Power Auth.*, 30 F.3d at 417. The court therefore correctly determined that appellees were likely to succeed on their claim that NEPA does not require the Service to conduct an environmental analysis prior to issuing an NTP.

> *2. Whether the APA Requires Notice and Comment Prior to Implementation of the Service's Policy on Issuance of NTPs*

The APA requires an agency to provide public notice and an opportunity to comment before promulgating a legislative or substantive rule. *See* 5 U.S.C. 553(b)-(c);

---

District Court, which does not require Service approval of roads or locations, was the "standard version." (J.A. 160.) The only deed included in the record by either party also contains this version of the rules. (J.A. 276.) The court therefore did not commit clear error in finding that 1911 rights "typically" incorporated the standard version of the 1911 regulations, and that these regulations did not impose a permit requirement. *Minard Run II*, 2009 WL 4937785, at *3.

*Lincoln v. Vigil*, 508 U.S. 182, 196 (1993); *Chao v. Rothermel*, 327 F.3d 223, 227 (3d Cir. 2003). Both the Settlement Agreement and the Marten Statement are "rules" within the meaning of the APA, because they are "agency statement[s] of general . . . applicability and future effect designed to implement, interpret, or prescribe law or policy." 5 U.S.C. § 551(4). The Service argues that both the Settlement Agreement and the Marten Statement are not substantive rules, but rather "rules of agency organization, procedure, or practice" excepted from the APA's notice and comment requirement.[13] *See* 5 U.S.C. § 553(b). We disagree.

As we have explained:

Legislative rules are subject to the notice and comment requirements of the APA because they work substantive changes in prior regulations, or create new law, rights, or duties. . . . Interpretative, or procedural, rules do not themselves shift the rights or interests of the parties, although they may change the way in which the parties present themselves to the agency.

---

[13] The Service also contends that the decision to perform a NEPA analysis is not a "rule" under the APA, but this misses point. Appellees do not object to the Service's conducting a NEPA analysis; they object only to its moratorium on issuing NTPs until the NEPA analysis is complete.

*SBC, Inc. v. FCC*, 414 F.3d 486, 497-98 (3d Cir. 2005) (citations and quotation marks omitted). The Settlement Agreement and the Marten Statement create new duties for mineral rights owners: the purpose and effect of the Settlement Agreement and the Marten Statement were to prevent new drilling by mineral rights owners during the course of a multi-year EIS. Additionally, in considering whether a rule makes "substantive changes in prior regulations" or "create[s] new law, rights, or duties," we consider whether the rule will "have a substantive adverse impact on the challenging party." *Chao*, 327 F.3d at 227. The Service's new policy has a "substantive adverse impact" on mineral rights owners because it directly interferes with their property rights to enter ANF lands and drill for oil and gas. Accordingly, the District Court properly found that appellees were likely to succeed on the merits of their claim that the Settlement Agreement and the Marten Statement are not merely procedural rules, but substantive rules that must be promulgated pursuant to the notice and comment procedures of the APA.

### B. *Irreparable Harm*

The District Court found that the Service's moratorium on new drilling irreparably harmed appellees because it infringed their property rights and threatened bankruptcy or closure for some businesses. The Service argues that the District Court's finding that some businesses would suffer temporary economic losses and might go bankrupt was insufficient to establish irreparable harm. We disagree. As a general matter, "a purely economic injury, compensable in money, cannot satisfy the irreparable injury requirement," *Frank's GMC Truck Ctr., Inc. v. GMC*, 847 F.2d 100, 102 (3d

34

Cir. 1988), but "an exception exists where the potential economic loss is so great as to threaten the existence of the movant's business." *Vaqueria Tres Monjitas, Inc. v. Irizarry*, 587 F.3d 464, 485 (1st Cir. 2009); *see also Doran v. Salem Inn, Inc.*, 422 U.S. 922, 932, (1975) (irreparable injury shown where business "would suffer a substantial loss of business and perhaps even bankruptcy" absent injunctive relief). Here, the District Court carefully considered and ultimately credited the testimony of several business owners that the new drilling moratorium had dramatically affected their business and would probably cause them to shut down or go bankrupt if it continued. *Minard Run II*, 2009 WL 4937785, at \*15-16 (citing J.A. 971-72, 978-79, 985-88, 1127-36).

Additionally, where "interests involving real property are at stake, preliminary injunctive relief can be particularly appropriate because of the unique nature of the property interest." *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1210 (10th Cir. 2009).[14] This is particularly true of the mineral

---

[14] *Accord Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S. of Am., Inc.*, 549 F.3d 1079, 1090 (7th Cir. 2008) ("As a general rule, interference with the enjoyment or possession of land is considered 'irreparable' since land is viewed as a unique commodity"); *East Tenn. Natural Gas Co. v. Sage*, 361 F.3d 808, 828-29 (4th Cir. 2004) (excluding owner from real property constituted irreparable injury); *Wonderland Shopping Ctr. Venture Ltd. P'ship v. CDC Mortg. Capital, Inc.*, 274 F.3d 1085, 1097 (6th Cir. 2001) (foreclosure causes irreparable injury because it results in loss of "unique real property"); *Carpenter Tech. Corp. v. City of Bridgeport*, 180 F.3d 93, 97 (2d Cir. 1999) (condemnation of real property constitutes irreparable harm because condemnee

rights at stake in this case. Under Pennsylvania law, oil and gas resources are subject to the "rule of capture," which permits an owner to extract oil and gas even when extraction depletes a single oil or gas reservoir lying beneath adjoining lands. *Barnard v. Monongahela Natural Gas Co.*, 65 A. 801 (Pa. 1907). The adjoining owner's only remedy against such drainage is to "go and do likewise." *Id.* The Service's moratorium on new drilling deprives mineral owners in the ANF of this remedy and will cause them to lose oil and gas to other landowners drilling on private lands adjoining the ANF, which are not subject to the moratorium.[15] (J.A. 155-56.) Therefore, the moratorium also causes irreparable injury to mineral rights owners by depriving them of the unique oil and gas extraction opportunities afforded them by their mineral rights. *See Siegal*, 552 F.3d at 1210 (finding irreparable injury where interference with property rights caused loss of unique opportunities).

### C. *The Balance of the Equities and the Public Interest*

Like the District Court, we consider together the final two elements of the preliminary injunction framework – the

---

has no adequate remedy at law); *K-Mart Corp. v. Oriental Plaza, Inc.*, 875 F.2d 907, 915 (1st Cir. 1989) ("Real estate has long been thought unique, and thus, injuries to real estate interests frequently come within the ken of the chancellor").

[15]Because the ANF is not a single continuous piece of land – the forest is dotted with numerous private holdings (J.A. 155-56, 2258, 2260) – this concern is not limited to mineral rights located on the periphery of the forest.

public interest and the balance of the equities. *See Nken*, 129 S. Ct. at 1762 ("assessing the harm to the opposing party and weighing the public interest . . . merge when the Government is the opposing party"). While the Service has an important statutory duty to protect and maintain the natural resources of the ANF, the District Court was not required to accept at face value its claims that a preliminary injunction will prevent it from doing so. Rather, the court was within its discretion to carefully consider the evidence presented by the parties to determine whether appellees had shown that the public interest favored an injunction. *See id.* at 1761; *but cf. Winter v. Natural Resources Defense Council, Inc.*, 129 S. Ct. 365, 377 (2008) (noting the need for special deference to "'complex, subtle, and professional decisions as to the composition, training, equipping, and control of a military force,' which are 'essentially professional military judgments'").

The District Court noted that the Service had successfully completed an EIS in 1986 without imposing a moratorium on new drilling or suspending the *Minard Run I* framework. *Id.* at \*6 n.2. The Service also conceded that this framework had adequately protected its interest in preserving the environmental resources of the ANF. *Id.* at \*15 (citing J.A. 652-53). However, the Service contended – and appellees vigorously disputed – that there was a recent significant increase in drilling in the ANF justifying a different approach to the current EIS. *Id.* at \*14 (citing J.A. 337-38, 653-54, 1280-81.) The District Court considered the conflicting evidence and found that although the number of wells had increased recently, "drilling activity in the ANF is somewhat cyclic in nature." *Id.* at \*14. Considered in historical context, "the total number of active wells in the

ANF immediately preceding the drilling ban was not appreciably greater than the number of existing wells in the mid-1980s, when the *Minard Run* [*I*] framework for processing Notices to Proceed was utilized." *Id.* The Service has not challenged this finding on appeal, and it is amply supported by the record.

Because the Service could not credibly distinguish the present circumstances from the preceding decades in which the *Minard Run I* framework was concededly effective in protecting the ANF, it was not clear error for the District Court to conclude that a preliminary injunction reinstating that framework would not harm the public interest or the interests of the Service in preserving the ANF. By contrast, granting the injunction would vindicate the public's interests in aiding the local economy, *see Earth Island Institute v. Carlton*, 626 F.3d 462, 475 (9th Cir. 2010), protecting the property rights of mineral rights owners, *see* 16 U.S.C. 518, and ensuring public participation in agency rulemaking as required by the APA, 5 U.S.C. §§ 552-53. On the record before it, the District Court therefore did not err in finding that the balance of the equities and the public interest favored injunctive relief.

## IV. <u>Conclusion</u>

For the reasons set forth above, we affirm the preliminary injunction entered by the District Court against appellants.